1

2

3

4

5

6

7

8                    **UNITED STATES DISTRICT COURT**

9                    **CENTRAL DISTRICT OF CALIFORNIA**

10

11  CATHERINE LEIGH ERTEL,            CASE NO. CV 18-9603 SS

12                Plaintiff,

13       v.                           **MEMORANDUM DECISION AND ORDER**

14  ANDREW M. SAUL, Commissioner
    of Social Security,[1]
15
                  Defendant.
16

17

18                              **I.**

19                         **INTRODUCTION**

20

21       Catherine Leigh Ertel ("Plaintiff") brings this action seeking

22  to overturn the decision of the Commissioner of Social Security

23  (the "Commissioner" or "Agency") denying her application for

24  Disability Insurance Benefits ("DIB").  The parties consented

25  ────────────────

26  [1]   Andrew  M.  Saul,  Commissioner  of  Social  Security,  is
    substituted for his predecessor Nancy A. Berryhill, whom Plaintiff
27  named in the Complaint.  See 42 U.S.C. § 405(g); Fed. R. Civ. P.
    25(d).
28

pursuant to 28 U.S.C. § 636(c) to the jurisdiction of the undersigned United States Magistrate Judge. (Dkt. Nos. 11, 17-18). For the reasons stated below, the decision of the Commissioner is REVERSED, and this case is REMANDED for further administrative proceedings consistent with this decision.

## II.

### THE FIVE-STEP SEQUENTIAL EVALUATION PROCESS

To qualify for disability benefits, a claimant must demonstrate a medically determinable physical or mental impairment that prevents the claimant from engaging in substantial gainful activity and that is expected to result in death or to last for a continuous period of at least twelve months. Reddick v. Chater, 157 F.3d 715, 721 (9th Cir. 1998) (citing 42 U.S.C. § 423(d)(1)(A)). The impairment must render the claimant incapable of performing work previously performed or any other substantial gainful employment that exists in the national economy. Tackett v. Apfel, 180 F.3d 1094, 1098 (9th Cir. 1999) (citing 42 U.S.C. § 423(d)(2)(A)).

To decide if a claimant is entitled to benefits, an Administrative Law Judge ("ALJ") conducts a five-step inquiry. 20 C.F.R. §§ 404.1520, 416.920. The steps are:

(1)   Is the claimant presently engaged in substantial gainful activity? If so, the claimant is found not disabled. If not, proceed to step two.

2

(2) Is the claimant's impairment severe?  If not, the claimant is found not disabled.  If so, proceed to step three.

(3) Does the claimant's impairment meet or equal one of the specific impairments described in 20 C.F.R. Part 404, Subpart P, Appendix 1?  If so, the claimant is found disabled.  If not, proceed to step four.

(4) Is the claimant capable of performing his past work? If so, the claimant is found not disabled.  If not, proceed to step five.

(5) Is the claimant able to do any other work?  If not, the claimant is found disabled.  If so, the claimant is found not disabled.

Tackett, 180 F.3d at 1098-99; see also Bustamante v. Massanari, 262 F.3d 949, 953-54 (9th Cir. 2001); 20 C.F.R. §§ 404.1520(b)-(g)(1), 416.920(b)-(g)(1).

The claimant has the burden of proof at steps one through four and the Commissioner has the burden of proof at step five. Bustamante, 262 F.3d at 953-54.  Additionally, the ALJ has an affirmative duty to assist the claimant in developing the record at every step of the inquiry.  Id. at 954.  If, at step four, the claimant meets his or her burden of establishing an inability to perform past work, the Commissioner must show that the claimant can perform some other work that exists in "significant numbers" in the national economy, taking into account the claimant's residual functional capacity ("RFC"), age, education, and work

3

experience.  <u>Tackett</u>, 180 F.3d at 1098, 1100; <u>Reddick</u>, 157 F.3d at 721; 20 C.F.R. §§ 404.1520(g)(1), 416.920(g)(1).  The Commissioner may do so by the testimony of a vocational expert ("VE") or by reference to the Medical-Vocational Guidelines appearing in 20 C.F.R. Part 404, Subpart P, Appendix 2 (commonly known as "the grids").  <u>Osenbrock v. Apfel</u>, 240 F.3d 1157, 1162 (9th Cir. 2001). When a claimant has both exertional (strength-related) and non-exertional limitations, the grids are inapplicable and the ALJ must take the testimony of a VE.  <u>Moore v. Apfel</u>, 216 F.3d 864, 869 (9th Cir. 2000) (citing <u>Burkhart v. Bowen</u>, 856 F.2d 1335, 1340 (9th Cir. 1988)).

## III.

### THE ALJ'S DECISION

The ALJ employed the five-step sequential evaluation process and concluded that Plaintiff was not disabled within the meaning of the Social Security Act (the "Act").  (AR 28-37).  At step one, the ALJ found that Plaintiff has not engaged in substantial gainful activity since May 1, 2013, the amended alleged onset date.[2]  (AR 30).  At step two, the ALJ found that Plaintiff's status post brain cancer with craniotomy, partial colectomy, thoracotomy, and lobectomy are severe impairments.[3]  (AR 30).  At step three, the

---

[2]    At her administrative hearing, Plaintiff amended her alleged onset date from September 30, 2010, to May 1, 2013.  (AR 46).

[3]    The ALJ also found that Plaintiff's medically determinable impairments of depression and anxiety do not cause more than minimal limitation in Plaintiff's ability to perform basic mental work limit and are therefore nonsevere.  (AR 30-31).

ALJ determined that Plaintiff does not have an impairment or combination of impairments that meet or medically equal the severity of any of the listings enumerated in the regulations.[4] (AR 30).

The ALJ then assessed Plaintiff's RFC and concluded that she can perform the full range of medium work as defined in 20 C.F.R. § 404.1567(c).[5] (AR 25). At step four, the ALJ found that Plaintiff is capable of performing past relevant work as an office manager and as a bookkeeper, as actually and generally performed. (AR 36). Accordingly, the ALJ found that Plaintiff was not under a disability as defined in the Act from May 1, 2013, through the date of the decision. (AR 36-37).

## IV.

### STANDARD OF REVIEW

Under 42 U.S.C. § 405(g), a district court may review the Commissioner's decision to deny benefits. "[The] court may set aside the Commissioner's denial of benefits when the ALJ's findings are based on legal error or are not supported by substantial evidence in the record as a whole." Aukland v. Massanari, 257 F.3d

---

[4] Specifically, the ALJ considered whether Plaintiff met the criteria for Listing 12.02 (neurocognitive disorders) and concluded that she did not. (AR 31-32).

[5] "Medium work involves lifting no more than 50 pounds at a time with frequent lifting or carrying of objects weighing up to 25 pounds. If someone can do medium work, we determine that he or she can also do sedentary and light work." 20 C.F.R. § 404.1567(c).

1033, 1035 (9th Cir. 2001) (citing Tackett, 180 F.3d at 1097); see
also Smolen v. Chater, 80 F.3d 1273, 1279 (9th Cir. 1996) (citing
Fair v. Bowen, 885 F.2d 597, 601 (9th Cir. 1989)).

"Substantial evidence is more than a scintilla, but less than
a preponderance." Reddick, 157 F.3d at 720 (citing Jamerson v.
Chater, 112 F.3d 1064, 1066 (9th Cir. 1997)). It is "relevant
evidence which a reasonable person might accept as adequate to
support a conclusion." (Id.). To determine whether substantial
evidence supports a finding, the court must "'consider the record
as a whole, weighing both evidence that supports and evidence that
detracts from the [Commissioner's] conclusion.'" Aukland, 257 F.3d
at 1035 (quoting Penny v. Sullivan, 2 F.3d 953, 956 (9th Cir.
1993)). If the evidence can reasonably support either affirming
or reversing that conclusion, the court may not substitute its
judgment for that of the Commissioner. Reddick, 157 F.3d at 720-
21 (citing Flaten v. Sec'y of Health & Human Servs., 44 F.3d 1453,
1457 (9th Cir. 1995)).

**V.**

**DISCUSSION**

Plaintiff raises four claims for relief. She contends that
the ALJ erred in (1) evaluating Plaintiff's cognitive disorder at
step two; (2) evaluating Plaintiff's cognitive disorder at step
three; (3) evaluating Plaintiff's subjective impairments and
complaints; and (4) determining Plaintiff's RFC and finding she
can return to her past work at step four. (Dkt. No. 23 at 4-16).

6

**A.  The ALJ's Reasons For Rejecting Multiple Medical Opinions Are Not Supported By Substantial Evidence**

An ALJ must take into account all medical opinions of record. 20 C.F.R. §§ 404.1527(b), 416.927(b).  The regulations "distinguish among the opinions of three types of physicians: (1) those who treat the claimant (treating physicians); (2) those who examine but do not treat the claimant (examining physicians); and (3) those who neither examine nor treat the claimant (nonexamining physicians)."  Lester v. Chater, 81 F.3d 821, 830 (9th Cir. 1995), as amended (Apr. 9, 1996).  "Generally, a treating physician's opinion carries more weight than an examining physician's, and an examining physician's opinion carries more weight than a reviewing [(nonexamining)] physician's."  Holohan v. Massanari, 246 F.3d 1195, 1202 (9th Cir. 2001); accord Garrison v. Colvin, 759 F.3d 995, 1012 (9th Cir. 2014).  "The weight afforded a non-examining physician's testimony depends 'on the degree to which they provide supporting explanations for their opinions.'"  Ryan v. Comm'r of Soc. Sec., 528 F.3d 1194, 1201 (9th Cir. 2008) (quoting 20 C.F.R. § 404.1527(d)(3)).

The medical opinion of a claimant's treating physician is given "controlling weight" so long as it "is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the claimant's] case record."  20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2).  "When a treating doctor's opinion is not controlling, it is weighted according to factors such as the length

of the treatment relationship and the frequency of examination, the nature and extent of the treatment relationship, supportability, and consistency with the record." Revels v. Berryhill, 874 F.3d 648, 654 (9th Cir. 2017); see also 20 C.F.R. §§ 404.1527(c)(2)-(6), 416.927(c)(2)-(6). Greater weight is also given to the "opinion of a specialist about medical issues related to his or her area of specialty." 20 C.F.R. §§ 404.1527(c)(5), 416.927(c)(5).

"To reject an uncontradicted opinion of a treating or examining doctor, an ALJ must state clear and convincing reasons that are supported by substantial evidence." Bayliss v. Barnhart, 427 F.3d 1211, 1216 (9th Cir. 2005). "If a treating or examining doctor's opinion is contradicted by another doctor's opinion, an ALJ may only reject it by providing specific and legitimate reasons that are supported by substantial evidence." Id.; see also Reddick, 157 F.3d at 725 (the "reasons for rejecting a treating doctor's credible opinion on disability are comparable to those required for rejecting a treating doctor's medical opinion."). "The ALJ can meet this burden by setting out a detailed and thorough summary of the facts and conflicting clinical evidence, stating his interpretation thereof, and making findings." Trevizo v. Berryhill, 871 F.3d 664, 675 (9th Cir. 2017) (citation omitted). "When an examining physician relies on the same clinical findings as a treating physician, but differs only in his or her conclusions, the conclusions of the examining physician are not 'substantial evidence.'" Orn v. Astrue, 495 F.3d 625, 632 (9th Cir. 2007).

### 1. Dr. Raffle

In November 2007, an MRI revealed a malignant non-small cell carcinoma in Plaintiff's brain, most likely a metastasis from lung cancer, which was subsequently diagnosed in December 2007. (AR 634). Whole-brain radiation treatment and chemotherapy sessions were administered from December 2007 through March 2008. (AR 634). Plaintiff had lung surgery in March 2008, removing her left lower lobe and part of her diaphragm. (AR 634). She was also diagnosed with colon cancer and treated with surgery in April 2008. (AR 634).

Brain MRIs in October 2008, May 2009, and December 2009 revealed no local recurrence of the tumor and no metastases, but there was mild diffuse cerebral cortical atrophy.[6] (AR 634). There was also considerable but stable periventricular and deep white matter hyperintensity related to chronic ischemia and radiation treatment.[7] (AR 634). A December 2010 brain MRI revealed stable

---

[6] "Cerebral atrophy is a common feature of many of the diseases that affect the brain. Atrophy of any tissue means loss of cells. In brain tissue, atrophy describes a loss of neurons and the connections between them. Atrophy can be generalized, which means that all of the brain has shrunk; or it can be focal, affecting only a limited area of the brain and resulting in a decrease of the functions that area of the brain controls. If the cerebral hemispheres (the two lobes of the brain that form the cerebrum) are affected, conscious thought and voluntary processes may be impaired." National Institute of Neurological Disorders and Stroke, Cerebral Atrophy Information Page, available at <https://www.ninds.nih.gov/Disorders/All-Disorders/Cerebral-atrophy-Information-Page> (last visited August 13, 2019).

[7] White matter hyperintensities "are associated with cognitive impairment, triple the risk of stroke and double the risk of dementia." Joanna M. Wardlaw, M.D., et al., What are White Matter

9

left temporal lobe encephalomalacia and volume loss with no midline shift and moderate chronic microangiographic ischemic changes.[8] (AR 634).

In May 2015, Plaintiff was referred by her neurologist, Valeri Yarema, M.D., to David L. Raffle, Ph.D., a licensed clinical neuropsychologist and a certified brain injury specialist, for a neuropsychological evaluation to clarify Plaintiff's current level of neuropsychological functioning, to determine possible etiologies for Plaintiff's relative weaknesses in cognitive impairment, and to confirm if current deficits prevent her from successfully engaging in full-time employment as an office manager. (AR 632). Over a three-day period, from May 2-4, 2015, Dr. Raffle reviewed the medical record, interviewed Plaintiff, conducted a mental status examination, and administered a battery of tests,

---

Hyperintensities Made of? (2015), available at <www.ncbi.nlm. nih.gov/pmc/articles/PMC4599520/> (last visited August 13, 2019). Ischemia "is a restriction in blood supply to tissues, causing a shortage of oxygen that is needed for cellular metabolism (to keep tissue alive).  . . .  Chronic ischemia of the brain may result in a form of dementia called vascular dementia."  <https://en. wikipedia.org/wiki/Ischemia> (last visited August 13, 2019).

[8]  "Cerebral softening, also known as encephalomalacia, is a localized softening of the substance of the brain, due to bleeding or inflammation.  . . .  White softening . . . occurs in areas that continue to be poorly perfused, with little to no blood flow.  These are known as 'pale' or 'anemic infarcts' and are areas that contain dead neuronal tissue, which result in a softening of the cerebrum." <en.wikipedia.org/wiki/Cerebral_softening#White_softening>  (last visited August 13, 2019).

and on May 29, 2015, Dr. Raffle submitted a thorough, detailed report.[9]  (AR 632-52).

Plaintiff reported multiple symptoms since her cancer treatment, including short-term memory problems, occasional word-finding difficulties, verbal paraphasias,[10] falling incidences, migraine headaches, and extreme photophobia.  (AR 634).  During the mental status examination, Plaintiff was able to recall only one of three words, which is indicative of possible mild cognitive impairment.  (AR 633).  Dr. Raffle administered over 25 psychological assessment tests.  (AR 637-43, 646-52).  The tests indicated that Plaintiff was mildly to moderately impaired in a number of functional areas, including memory, recall, and learning. (AR 646-52).  Dr. Raffle summarized the test results:

> There is evidence of a modest impairment in memory that represents a significant decline from [Plaintiff's] level of performance prior to her cancer treatment. . . .  Her brain tumor excision and subsequent whole-brain radiation and chemotherapy appear to have had a significant negative effect on the functioning of the left side of her brain, resulting in

---

[9]  The ALJ mistakenly refers to this evaluation as being performed by Dr. Yarema.  (AR 35).

[10]  "Paraphasia is a type of language output error commonly associated with aphasia, and characterized by the production of unintended syllables, words, or phrases during the effort to speak."  <https://en.wikipedia.org/wiki/Paraphasia> (last visited August 13, 2019).

significant impairment in her ability to recall what she
has heard, especially when confronted with large amounts
of information.  Testing verified that she can recall at
any one time only a small amount of information, and she
will not be able to remember any additional information
even if the information is repeated to her several times.
Her treatment has resulted in a significant number of
verbal paraphasias, which have negatively affected her
ability to communicate clearly.  . . .  [Plaintiff] is
experiencing an organic mental disorder caused by
surgical excision of brain tissue, chemotherapy, and
radiation exposure that has resulted in moderate
impairment in her neuropsychological functioning,
including a significant loss of memory abilities and
communication difficulties.

(AR 644).  Dr. Raffle diagnosed mild neurocognitive disorder,
persistent, without behavioral disturbance, induced by surgical
excision of brain tissue, chemotherapy and whole-brain radiation;
adjustment disorder with depressed mood, mild; and major depressive
disorder, recurrent, mild.  (AR 644).  He opined that Plaintiff's
impairments

directly affect her functional capacity to complete work
relevant to her profession as an office manager.  These
impairments have resulted not only in marked difficulties
in maintaining employment, but also have resulted in
frequent failure to complete tasks in an accurate and

timely manner in the work setting, preventing her from
engaging in substantial and gainful work activity.

(AR 644). Dr. Raffle concluded that Plaintiff appears to meet the criterial of Listing 12.02 (neurocognitive disorders). (AR 644). After reviewing Dr. Raffle's assessment, the state agency psychological consultant largely agreed (AR 653-54), finding that Plaintiff is moderately limited in her ability to understand, remember and carry out detailed instructions, maintain attention and concentration for extended periods, complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods, respond appropriately to changes in the work setting, and travel in unfamiliar places or use public transportation (AR 669-70).

The ALJ gave Dr. Raffle's opinion "little weight." (AR 35). She found the opinion "internally inconsistent because [Dr. Raffle] opined [Plaintiff] was permanently disabled, yet she gave [Plaintiff] diagnoses of a mild neurocognitive disorder without behavioral disturbance, a mild adjustment disorder, [and] a mild depressive disorder." (AR 35). Dr. Raffle's opinion was contradicted by the opinion of Banafshe P. Sharokhi, Ph.D., who conducted a psychological evaluation in July 2014. (AR 599-609). As Dr. Raffle's opinion was contradicted by an earlier medical evaluation, the ALJ was required to give specific and legitimate reasons that were supported by substantial evidence in the record for rejecting Dr. Raffle's opinion. See Lester, 81 F.3d at 830-31

13

("the opinion of an examining doctor, even if contradicted by another doctor, can only be rejected for specific and legitimate reasons that are supported by substantial evidence in the record"). The ALJ's rejection of Dr. Raffle's opinion does not satisfy these standards.

First, Dr. Raffle's opinion is supported by his own extensive examinations and testing. In evaluating a consultative examiner's opinion, the ALJ must consider the extent to which the opinion is supported by clinical and diagnostic examinations in determining the weight to give the opinion. Revels, 874 F.3d at 654; 20 C.F.R. §§ 404.1527(c)(2)-(6), 416.927(c)(2)-(6). While the ALJ summarized Dr. Raffle's clinical conclusions, she did not discuss the specific testing -- performed over a three-day period -- or the results of the testing. (AR 35). "[A]n ALJ may not pick and choose evidence unfavorable to the claimant while ignoring evidence favorable to the claimant." Cox v. Colvin, 639 F. App'x 476, 477 (9th Cir. 2016) (citing Ghanim v. Colvin, 763 F.3d 1154, 1164 (9th Cir. 2014)). Dr. Raffle's assessment is supported by the test results, which indicated mild to moderate impairments in multiple cognitive functions, especially with recall, memory, and communication skills. (AR 638-43, 646-52).

Dr. Raffle's opinion is also supported by the medical records that he reviewed, including multiple MRI studies. (AR 632). For example, a May 2009 brain MRI revealed mild diffuse cerebral cortical atrophy, along with deep white matter hyperintensity related to chronic ischemia and radiation treatment. (AR 576,

634).  In December 2010, a brain MRI indicated left temporal lobe encephalomalacia and volume loss and moderate chronic microangiographic ischemic changes.  (AR 567, 634).  Similar findings were noted in July 2014, August 2015, and in July 2016, when Plaintiff's white matter hyperintensity had increased from moderate to severe.  (AR 620-21, 695).

Second, this Court has a different interpretation than the ALJ of Dr. Raffle's diagnoses.  Dr. Raffle clearly indicated that Plaintiff's functional limitations were the result of her persistent mild neurocognitive disorder, and not due to Plaintiff's anxiety or depression.  (AR 644).  The characterization of Plaintiff's neurocognitive disorder as "mild" does not indicate "mild" symptoms.  Instead, DSM-5 distinguishes between two neurocognitive disorders: "mild" and "major," the latter replacing the use of "dementia."[11]  Mark Moran, Mild Neurocognitive Disorder Added to DSM (2013) ("Mild neurocognitive disorder . . . recognizes the many patients seen by clinicians who do not meet [the] criteria for dementia but who are nevertheless clinically impaired.").[12] Mild neurocognitive disorder is used to "emphasize loss of previously acquired cognitive functions," including complex attention, learning and memory, executive ability, language, visual-constructional-perceptual ability, and social cognition.

[11]  DSM-5 refers to the American Psychiatric Association's Diagnostic and Statistical Manual of the American Psychiatric Association (Fifth edition).

[12]  The article is available at <https://psychnews. psychiatryonline.org/doi/full/10.1176/appi.pn.2013.5a18>  (last visited August 13, 2019).

Mary Ganguli, M.D., et al., Classification of Neurocognitive Disorders in DSM-5: A Work in Progress (2011).[13]  Indeed, labeling a diagnosis as "mild" does not preclude a severe or even a listing level impairment.  See, e.g., Gomez v. Astrue, 695 F. Supp. 2d 1049, 1053 (C.D. Cal. 2010) (finding that "mild" mental retardation meets Listing 12.05).  The ALJ's lay opinion of Plaintiff's medical condition cannot provide the medical evidence needed to support the ALJ's RFC determination.  See Tackett, 180 F.3d at 1102-03 (there was no medical evidence to support the ALJ's determination); Day v. Weinberger, 522 F.2d 1154, 1156 (9th Cir. 1975) (an ALJ is forbidden from making his or her own medical assessment beyond that demonstrated by the record); Rohan v. Chater, 98 F.3d 966, 970 (7th Cir. 1996) ("ALJs must not succumb to the temptation to play doctor and make their own independent medical findings").

Finally, Dr. Raffle did not opine on whether Plaintiff is "disabled."  Indeed, whether a claimant is disabled is an issue reserved for the Commissioner. 20 C.F.R. § 416.927(e)(1); see McLeod v. Astrue, 640 F.3d 881, 885 (9th Cir. 2011) ("A treating physician's evaluation of a patient's ability to work may be useful or suggestive of useful information, but a treating physician ordinarily does not consult a vocational expert or have the expertise of one.  An impairment is a purely medical condition.  A disability is an administrative determination of how an impairment, in relation to education, age, technological, economic, and social

---

[13]  The article is available at <https://www.ncbi.nlm.nih.gov/pmc/articles/PMC3076370/pdf/nihms-273128.pdf> (last visited August 13, 2019).

factors, affects ability to engage in gainful activity."). Instead, Dr. Raffle merely concluded that Plaintiff was unable to perform her past work as an office manager. (AR 644).

Defendant argues that in rejecting the opinions of Dr. Raffle and the state agency consultant, the ALJ properly relied on the opinions of the examining psychologist, the testifying medical expert, and the treating opinion of Dr. Nishikubo. (Dkt. No. 24 at 2-7). On July 16, 2014, Dr. Sharokhi conducted a psychological evaluation at the request of the Agency. (AR 599-609). She reviewed a few medical records and conducted three tests. (AR 599, 601). Dr. Sharokhi diagnosed depressive disorder and opined that Plaintiff has a mild inability to understand, remember and carryout short, simple instructions, to maintain attention and concentration, and to maintain persistence and pace. (AR 607, 608).

The ALJ gave Dr. Sharokhi's opinion "great weight," finding it supported by the test results and the medical record. (AR 34-35). The ALJ's assessment is not supported by substantial evidence. First, as discussed above, multiple MRI studies revealed chronic, severe brain deficits. Second, most of the medical evidence provided to Dr. Sharokhi predated Plaintiff's amended alleged onset date. (AR 601). Finally, Dr. Sharokhi errantly noted that the medical records she reviewed included no history of memory deficits or diagnosed cognitive disorders. (AR 601). To the contrary, the December 2010 brain MRI reviewed by Dr. Sharokhi (AR 601) indicates a history of short-term memory problems (AR

576).  Similarly, other reports provided to Dr. Sharokhi reflect ongoing issues with Plaintiff's short term memory.  (AR 493, 498).

While both Dr. Raffle and Dr. Sharokhi were examining physicians, Dr. Raffle's opinion is deserving of greater weight. Dr. Raffle is a licensed clinical neuropsychologist and a certified brain injury specialist (AR 632), specialties which directly relate to Plaintiff's psychological functioning.  "[T]he opinions of a specialist about medical issues related to his or her area of specialization are given more weight than the opinions of a nonspecialist."  Smolen, 80 F.3d at 1285 (citing 20 C.F.R. § 404.1527(c)(5)).  Dr. Raffle issued his opinion after conducting a mental status examination and administering an exhaustive battery of over 25 psychological tests during a three-day period.  (AR 632-33, 637).  Dr. Sharokhi, however, administered only three tests (AR 599) and failed to fully explain some of her findings.  For example, Plaintiff needed instructions repeated during the testing yet Dr. Sharokhi found only a mild impairment in concentration and attentions.  (AR 604, 608).  Dr. Sharokhi also performed the Weschler Memory Scale test, which includes tests for both immediate and delayed memory, yet she provided test results only for immediate memory.  (AR 606).  Critically, this is an area where Dr. Raffle's testing revealed a moderate impairment.  (AR 638-39). As Dr. Raffle concluded, "[Plaintiff's] brain tumor excision and subsequent whole-brain radiation and chemotherapy appear to have had a significant negative effect on the functioning of the left side of her brain, resulting in significant impairment in her ability to recall what she has heard, especially when confronted

18

with large amounts of information." (AR 644). The ALJ must give more weight to opinions based on objective evidence, such as test results." See 20 C.F.R. § 404.1527(c)(3) ("The more a medical source presents relevant evidence to support a medical opinion, particularly medical signs and laboratory findings, the more weight we will give that medical opinion. The better an explanation a source provides for a medical opinion, the more weight we will give that medical opinion. Furthermore, because nonexamining sources have no examining or treating relationship with you, the weight we will give their medical opinions will depend on the degree to which they provide supporting explanations for their medical opinions.").[14]

The ALJ also gave "great weight" to the testimony of the medical expert (AR 33), who concluded that Plaintiff did not meet a listed impairment and was capable of the full range of medium work. (AR 55-56). The medical expert's conclusion was largely based on his finding that Dr. Raffle found only "mild problems." (AR 54-55). However, as discussed above, the "mild" neurocognitive disorder diagnosis does not indicate that Plaintiff has "mild" symptoms. Nor did the medical expert acknowledge the specific findings on the neurocognitive testing performed by Dr. Raffle, including Plaintiff's deficits in delayed memory recall.

---

[14] The ALJ gave the state agency psychological consultant's opinion only "partial weight," largely based on the consultative examiner's opinion. (AR 36). However, because Dr. Raffle's opinion was deserving of greater weight than Dr. Sharokhi's, the ALJ's assessment of the consultant's opinion is not supported by substantial evidence.

Critically, the medical expert did not address Dr. Raffle's finding that Plaintiff's "modest impairment in memory" caused her to "recall at one time only a small amount of information" and cannot remember additional information "even if the information is repeated to her several times." (AR 644). The medical expert also mischaracterized the brain MRI results as "clean." (AR 54). While the cited brain MRI found no residual or recurrent tumor, it noted moderate to severe white matter hyperintensity and mild atrophy, indicative of cognitive impairment. (AR 695).

The Commissioner emphasizes that the medical expert is a diplomate in three medical fields. (Dkt. No. 24 at 4). However, these fields -- medical examiner, internal medicine, and oncology (AR 677) -- do not cover Plaintiff's neurocognitive impairment that resulted from her chemotherapy and radiation treatment. Indeed, the medical expert stated that Dr. Raffle made neurological and psychological evaluations and admitted that he, the medical expert, is not an expert in either of those fields but would give his opinion anyway.[15] (AR 51-53). For all these reasons, the decision below erred in giving more weight to the medical expert's opinion than Dr. Raffle's.

---

[15] It appears that the medical expert reviewed the MRIs as an oncologist looking for recurrent metastatic disease, rather than other findings that affect cognition. Given that Plaintiff alleged disabilities due to short-term memory deficits resulting from chemotherapy and radiation treatment (AR 221), the ALJ should have sought an expert in the appropriate field.

The ALJ also credited the opinion of Carol Nishikubo, M.D., Plaintiff's treating physician. (AR 34). In June 2014, Dr. Nishikubo opined that Plaintiff's neoplastic disease was controlled with current treatment.[16] (AR 584-85). Nevertheless, she also opined that Plaintiff suffers from residual complications, including fatigue, difficulty concentrating, decreased stamina, and recurrent headaches, which affect her daily functioning. (AR 585). While the ALJ gave Dr. Nishikubo's opinion "great weight," she did not address any of these limitations or include them in assessing Plaintiff's RFC. (AR 34).

In sum, the ALJ failed to provide specific and legitimate reasons for rejecting Dr. Raffle's opinion. On remand, the ALJ shall reevaluate the weight to be afforded Dr. Raffle's opinion.

**2. Dr. Fang**

In January 2015, Lichuan Fang, M.D., Plaintiff's treating physician, opined that Plaintiff is permanently disabled and unable to engage in meaningful work. (AR 628-29). Dr. Fang concluded that Plaintiff continues to struggle with thinking clearly, managing tasks, poor memory, and confusion. (AR 628). Indeed, Plaintiff has "significant short term memory impairment despite writing everything down on paper." (AR 628). Further, Plaintiff "faces tremendous challenges in completing the simplest tasks and

---

[16] "Neoplastic diseases are conditions that cause tumor growth — both benign and malignant." <https://www.healthline.com/health/neoplastic-disease> (last visited August 14, 2019).

has difficulties with higher level functioning cognitive tasks as well." (AR 628).

The ALJ gave Dr. Fang's opinion "little weight," finding no indication Dr. Fang was relying on medical records that had been reviewed. (AR 35). The ALJ also rejected Dr. Fang's opinion because she treated Plaintiff "only for physical impairments" and "there was no evidence in the medical records of post-chemotherapy cognitive impairment." (AR 35). The ALJ's assessment is not supported by substantial evidence. Dr. Fang is part of UCLA Santa Monica Bay Physicians (AR 628), which is Plaintiff's primary treating group. The medical records from Bay Physicians document ongoing treatment for fatigue, cognitive problems, depression, and anxiety. (AR 282, 289, 296, 301, 315, 378, 421, 447). Further, both Dr. Raffle and Dr. Nishikubo found post-chemotherapy cognitive impairment, as discussed above.

In sum, the ALJ failed to provide specific and legitimate reasons for rejecting Dr. Fang's opinion. On remand, the ALJ shall reevaluate the weight to be afforded Dr. Fang's opinion.

### 3. Dr. deMayo

In July 2016, Robert A. deMayo, Ph.D., board certified in clinical psychology, reported that he had been treating Plaintiff since February 2016. (AR 697). During her treatment sessions, Plaintiff presented with complaints of severe depression and anxiety, including depressed and anxious mood, decreased energy

level, crying episodes, diminished ability to concentrate, and indecisiveness. (AR 697). Plaintiff also reported ongoing cognitive deficits in memory and attention subsequent to brain surgery and radiation treatment. (AR 697). Dr. deMayo diagnosed major depression, recurrent, and opined that Plaintiff is psychologically disabled. (AR 697).

The ALJ gave Dr. deMayo's opinion "little weight," finding that "he apparently relied quite heavily on the subjective report of symptoms and limitations provided by [Plaintiff]." (AR 36). "An ALJ may reject a treating physician's opinion if it is based to a large extent on a claimant's self-reports that have been properly discounted as incredible." Tommasetti v. Astrue, 533 F.3d 1035, 1041 (9th Cir. 2008). However, as discussed below, the ALJ did not properly discount Plaintiff's subjective statements. In any event, Dr. deMayo did not rely solely on Plaintiff's subjective symptoms. In his report, Dr. deMayo clearly indicated that Plaintiff's "memory and concentration issues have been apparent in our ongoing sessions." (AR 697).

In sum, the ALJ failed to provide specific and legitimate reasons for rejecting Dr. deMayo's opinion. On remand, the ALJ shall reevaluate the weight to be afforded Dr. deMayo's opinion.

1   **B.    The ALJ's Reasons for Discrediting Plaintiff's Subjective**

2        **Symptom Testimony Were Not Supported By Substantial Evidence**

3

4        Plaintiff alleges disabilities due to short-term memory

5   deficits resulting from radiation and chemotherapy. (AR 221). She

6   testified that after her cancer treatment, she tried to return to

7   work but was unable to perform the way she used to. (AR 61). Her

8   memory was short, so she tried to write things down but then could

9   not remember where she left her writing pad. (AR 61-62).

10  Plaintiff's primary difficulty is with memory, recall, focusing,

11  and communicating. (AR 69, 71, 76). She also suffers from

12  insomnia, anxiety, nervousness, difficulty concentrating, and

13  migraine headaches. (AR 68, 71-72).

14

15       When assessing a claimant's credibility regarding subjective

16  pain or intensity of symptoms, the ALJ must engage in a two-step

17  analysis. Trevizo, 871 F.3d at 678. First, the ALJ must determine

18  if there is medical evidence of an impairment that could reasonably

19  produce the symptoms alleged. Garrison, 759 F.3d at 1014. "In

20  this analysis, the claimant is not required to show that her

21  impairment could reasonably be expected to cause the severity of

22  the symptom she has alleged; she need only show that it could

23  reasonably have caused some degree of the symptom." Id. (emphasis

24  in original) (citation omitted). "Nor must a claimant produce

25  objective medical evidence of the pain or fatigue itself, or the

26  severity thereof." Id. (citation omitted).

27

28

If the claimant satisfies this first step, and there is no evidence of malingering, the ALJ must provide specific, clear and convincing reasons for rejecting the claimant's testimony about the symptom severity. Trevizo, 871 F.3d at 678 (citation omitted); see also Smolen, 80 F.3d at 1284 ("[T]he ALJ may reject the claimant's testimony regarding the severity of her symptoms only if he makes specific findings stating clear and convincing reasons for doing so."); Robbins v. Soc. Sec. Admin., 466 F.3d 880, 883 (9th Cir. 2006) ("[U]nless an ALJ makes a finding of malingering based on affirmative evidence thereof, he or she may only find an applicant not credible by making specific findings as to credibility and stating clear and convincing reasons for each."). "This is not an easy requirement to meet: The clear and convincing standard is the most demanding required in Social Security cases." Garrison, 759 F.3d at 1015 (citation omitted).

In discrediting the claimant's subjective symptom testimony, the ALJ may consider the following:

> (1) ordinary techniques of credibility evaluation, such as the claimant's reputation for lying, prior inconsistent statements concerning the symptoms, and other testimony by the claimant that appears less than candid; (2) unexplained or inadequately explained failure to seek treatment or to follow a prescribed course of treatment; and (3) the claimant's daily activities.

Ghanim, 763 F.3d at 1163 (citation omitted).  Inconsistencies between a claimant's testimony and conduct, or internal contradictions in the claimant's testimony, also may be relevant. Burrell v. Colvin, 775 F.3d 1133, 1137 (9th Cir. 2014); Light v. Soc. Sec. Admin., 119 F.3d 789, 792 (9th Cir. 1997).  In addition, the ALJ may consider the observations of treating and examining physicians regarding, among other matters, the functional restrictions caused by the claimant's symptoms.  Smolen, 80 F.3d at 1284; accord Burrell, 775 F.3d at 1137.  However, it is improper for an ALJ to reject subjective testimony based "solely" on its inconsistencies with the objective medical evidence presented. Bray v. Comm'r of Soc. Sec. Admin., 554 F.3d 1219, 1227 (9th Cir. 2009) (citation omitted).

Further, the ALJ must make a credibility determination with findings that are "sufficiently specific to permit the court to conclude that the ALJ did not arbitrarily discredit claimant's testimony." Tommasetti, 533 F.3d at 1039 (citation omitted); see Brown-Hunter v. Colvin, 806 F.3d 487, 493 (9th Cir. 2015) ("A finding that a claimant's testimony is not credible must be sufficiently specific to allow a reviewing court to conclude the adjudicator rejected the claimant's testimony on permissible grounds and did not arbitrarily discredit a claimant's testimony regarding pain.") (citation omitted).  Although an ALJ's interpretation of a claimant's testimony may not be the only reasonable one, if it is supported by substantial evidence, "it is not [the court's] role to second-guess it." Rollins v. Massanari, 261 F.3d 853, 857 (9th Cir. 2001).

The ALJ discounted Plaintiff's subjective statements, finding "no evidence in the medical records of post-chemotherapy cognitive impairment." (AR 34). As discussed above, however, multiple treating and examining physicians opined that Plaintiff suffers from post-chemotherapy neurocognitive disorder. (AR 628-29, 644, 697; see id. 669-72). Multiple brain MRIs document cognitive deficits. (AR 567, 576, 620-21, 695). Furthermore, Dr. Raffle's exhaustive battery of psychological tests indicate that Plaintiff has a significant impairment in memory and in her ability to recall and communicate. (AR 644).

The ALJ also discounted Plaintiff's subjective symptoms because "[s]he was able to work for many years successfully after her chemotherapy." (AR 34). While Plaintiff did have significant earnings in 2009 and 2010 (AR 202), this does not represent "many" years. Further, Plaintiff testified that after completing her cancer treatments, she returned to work in a different position, had difficulty performing her job as her memory was impaired, and tried to write things down, but then forgot where she left her notes, and was eventually terminated from her position. (AR 61-62, 64-65). See Lingenfelter v. Astrue, 504 F.3d 1028, 1036-37 (9th Cir. 2007) (ALJ erred in relying on brief and failed period of work as proof that plaintiff's pain was not disabling). In any event, Plaintiff does not allege that she was disabled prior to May 2013.

Finally, the ALJ discredited Plaintiff's subjective statements because "[a]ll of her brain MRIs showed no residual or

recurrent disease metastatic." (AR 34). The decision below, however, fails to mention that the MRIs indicated deficits in Plaintiff's brain that support the cognitive disorder diagnosis. (AR 567, 576, 620-21, 695). The fact that her cancer has not returned does not invalidate her allegations of memory, recall, concentration, and communication impairments caused by the resection of her brain, chemotherapy, and radiation treatment.

In sum, the decision below failed to provide clear and convincing reasons, supported by substantial evidence, for rejecting Plaintiff's subjective symptoms. The matter is remanded for further proceedings. On remand, the ALJ shall reevaluate Plaintiff's symptoms in accordance with the current version of the Agency's regulations and guidelines, taking into account the full range of medical evidence.

**C.** **The ALJ Failed To Properly Assess Plaintiff's Cognitive Disorder As A Severe Impairment At Step Two Of The Evaluation**

By its own terms, the evaluation at step two is a de minimis test intended to weed out the most minor of impairments. See Bowen v. Yuckert, 482 U.S. 137, 153-54 (1987) (O'Connor, J., concurring); Edlund v. Massanari, 253 F.3d 1152, 1158 (9th Cir. 2001) ("We have defined the step-two inquiry as a de minimis screening device to dispose of groundless claims."). Further, at step two, "the ALJ must consider the combined effect of all of the claimant's impairments on her ability to function, without regard to whether each alone was sufficiently severe." Smolen, 80 F.3d at 1290

(citation omitted); <u>see</u> SSR 85-28.  An impairment is not severe "only if the evidence establishes a slight abnormality that has not more than a minimal effect on an individual's ability to work." <u>Smolen</u>, 80 F.3d at 1290 (citation omitted).  "Thus, applying [the Court's] normal standard of review to the requirements of step two, [the Court] must determine whether the ALJ had substantial evidence to find that the medical evidence clearly established that [Plaintiff] did not have a medically severe impairment or combination of impairments." <u>Webb v. Barnhart</u>, 433 F.3d 683, 687 (9th Cir. 2005).

According to the Commissioner's regulations, "[a]n impairment or combination of impairments is not severe if it does not significantly limit your physical or mental ability to do basic work activities."  20 C.F.R. §§ 404.1522(a), 416.922(a).  "Basic work activities are abilities and aptitudes necessary to do most jobs, including, for example, walking, standing, sitting, lifting, pushing, pulling, reaching, carrying or handling." <u>Smolen</u>, 80 F.3d at 1290 (citation omitted); <u>see</u> 20 C.F.R. §§ 404.1522(b), 416.922(b); SSR 85-28.  Nevertheless, the Commissioner has emphasized that "[g]reat care should be exercised in applying the not severe impairment concept."  SSR 85-28, at *4.  Accordingly, if the ALJ is "unable to determine <u>clearly</u> the effect of an impairment or combination of impairments on the individual's ability to do basic work activities, the sequential evaluation process should not end with the not severe evaluation step." <u>Id.</u> (emphasis added).  Instead, the sequential evaluation process should continue through steps three, four, and five to "evaluate

the individual's ability to do past work, or to do other work based on the consideration of age, education, and prior work experience." Id.

Here, the ALJ erred at step two when she failed to acknowledge Plaintiff's cognitive disorder as a severe impairment. As discussed above, Plaintiff's cognitive disorder is supported by the opinions of Drs. Raffle, Nishikubo, and deMayo and the state agency psychological consultant, Dr. Raffle's extensive testing, the brain MRI results, and Plaintiff's subjective statements. There is significant medical evidence that Plaintiff's cognitive disorder causes severe deficits in memory, recall, concentration, and communication. Because a step two evaluation is to dispose of "groundless claims," and substantial evidence here establishes that Plaintiff suffers from a cognitive impairment, the ALJ erred by failing to identify Plaintiff's cognitive disorder as a severe impairment. This is not the "total absence of objective evidence of severe medical impairment" that would permit us to affirm "a finding of no disability at step two." Webb, 433 F.3d at 688 (reversing a step-two determination "because there was not substantial evidence to show that Webb's claim was 'groundless'"). The evidence in the record was sufficient for the ALJ to conclude that Plaintiff's cognitive disorder was a severe impairment at step two under the de minimis test.

For the foregoing reasons, the matter is remanded for further proceedings. On remand, the ALJ must evaluate Plaintiff's cognitive disorder as a severe impairment at step-two and include

limitations imposed by Plaintiff's cognitive disorder in the ALJ's overall evaluation of Plaintiff. The ALJ must consider the impact of Plaintiff's cognitive disorder and other impairments, as well as the entire medical record, on her RFC.[17]

# VI.

## CONCLUSION

Accordingly, IT IS ORDERED that Judgment be entered REVERSING the decision of the Commissioner and REMANDING this matter for further proceedings consistent with this decision. IT IS FURTHER ORDERED that the Clerk of the Court serve copies of this Order and the Judgment on counsel for both parties.

DATED: August 21, 2019

/S/
SUZANNE H. SEGAL
UNITED STATES MAGISTRATE JUDGE

**THIS DECISION IS NOT INTENDED FOR PUBLICATION IN WESTLAW, LEXIS/NEXIS OR ANY OTHER LEGAL DATABASE.**

---

[17] Plaintiff also argues that the ALJ erred in evaluating her cognitive impairment at step three and in concluding she can perform past relevant work at step four. (Dkt. No. 23 at 12, 15-16). However, it is unnecessary to reach Plaintiff's arguments on these grounds, as the matter is remanded for the alternative reasons discussed at length in this Order.